The second cases for argument are 22-3623 from the District of Northern Iowa, Laney Griner v. King for Congress, consolidated with 23-2117, also from the District of Northern Iowa, Laney Griner et al. v. Stephen King et al. Mr. Blankenship. Good morning, Your Honors. My name is Michael Blankenship. I'm here on behalf of King for Congress and Congressman Stephen King. The Internet is changing the way that people communicate. Probably not for the better. But the Internet has its own culture, and it's a different culture. It's a new culture, and part of that communication culture is the use of memes. You know, back in our day, there were a handful of photographs that just everybody knew. For example, the sailor kissing the woman in Times Square. The lady with the mesmerizing eyes in front of National Geographic. Shooting Lee Harvey Oswald. Well now, so memes are a combination. Sitting someone like a postcard. There's a pithy message and a relevant image. And that's what we're dealing with today. This involves one of the top five most known memes in the world, Success Kit. So the campaign committee on a third-party website posted a meme, like billions of other people do have, with this same kid. Fund our memes. And one of the interesting parts about the litigation in the trial court is that the trial court identified that there is actually not in this circuit. I'm not so sure about that. But that there is not an implied license fall in this circuit. So a lot of this is first impression to the circuit. And in doing so, the trial court relied on a Fourth Circuit case called Nelson Salavas. I'm a Fourth Circuit attorney, by the way. So I was actually quite familiar with it. But in doing so, the judge required that there be a meeting of the minds. This relates to implied license? Yes. Wasn't that waived or forfeited below? No, it was not. Well, I think that's the argument on the other side, isn't it, that you basically abandoned that below and conceded in open court that that was not an issue anymore in the case? Well, what we conceded is that we could not win. We did not concede the fact that implied license does not apply. Under the methodology formulated by this Court, we agree that we cannot prevail on that. And that's why I'm here. I'm asking this Court to change the framework that the trial court decided on. Now, you know the words. I have the words in front of me that were said. It's in the appendix at 1307 to 1309. Yes. But I have the very words that said, aren't they just said too many times in too many ways by the judge and by counsel that that's surely now waived for appeal? Well, that's our position, that it's not waived for appeal. Well, let's talk about that. I mean, the judge says implied license has been conceded by the defendants. No objection on your part. Nobody stands up and says, hold on, judge. We haven't conceded anything. We continue to object to your underlying ruling. That's never said. And then the judge says later, you know, defendants have elected not to pursue the implied license affirmative defense, so I've simply removed that instruction from your set of instructions because it's no longer relevant. Once again, no objection, no exception. Right? And they at no point does the defendant ever argue that the defense has been that they haven't withdrawn the defense. And so, I mean, that looks an awful lot like a conscious decision that looks like a waiver. And I get where you're saying we didn't waive anything, but how is the trial judge supposed to know that there wasn't a waiver going on? Because the point at which it mattered was when we talked about, was when I said that we cannot succeed under this framework. The point that matters, the midpoint where we're moving for not trial, not standing verdict, but the midpoint between the two burdens. What's the legal significance of not objecting to the application of the Nelson Salavis, however you say that, or Salavis factors in this context, right? I mean, because we're going through the whole thing and there's never an objection to any of it, right? I mean, there's an objection at the very beginning, then the judge says what he says, and then all of a sudden it's just like never raised again. Nobody says, I mean, I tried a lot of cases, like hundreds and hundreds of them as a district judge and as a state trial judge. And, you know, my experience always is that at some point he says, you know, subject to our previous objections, Your Honor, we are not going to object to the framework as set forth, right? None of that happens here. Well, Your Honor, as a, in practical purposes in the trial, like I'm not sure what we would object to, for example, witness testimony. What part of witness testimony would we object to? I would suggest that there's not a part of that. And the part where the judge is asking the point that matters, what should my ruling be on implied license, we directly tell the court we cannot prevail under this framework and we leave it at that. Later opinions by the judge, later thoughts, offhand, I don't know about offhand comments, but I'm not sure why later musings by the judge would change what happened at the moment of impact. Okay. Thanks. And here, this is, one of the reasons this matters is that this is a fundamental fairness issue. We would point this court to the Field v. Google opinion, where, and interestingly, the trial court did too. Like, they considered the Field v. Google opinion, and unusually, they came, the trial court came to the conclusion that there was a meeting of the minds. But Google and Field never talked with each other. The trial court relied on the idea that there's a meeting of the minds and that there's a request for the creation of the copyrighted work. That never happened in Field v. Google. That never happened in our case. And it's particularly dangerous here because the plaintiff is bombarding the Internet with the meme. She's basically, it's like a hunting trap, circulating the meme out to the world or seeing that it is being distributed to the world and not doing anything about it. In fact, she created several of her own memes involving that. She has a fan page where she has instructions on how to create the meme. She has a copyright on it, right? Yes. Okay. Proceed. The image itself, which is copyrighted, there are instructions on the Success Kit fan page of how to create your own. She commented on it. She begged people to use it, and then once, when someone who's For the IMP, for the mass distribution? No. Yeah, but for some uses of it, was she paid? Yes. Thank you for the concrete answers. For the more rigid, structured ones, like the large companies and whatnot. Sure. But for several not. The deeper pockets. Go ahead. But, you know, if this were a pie chart, the sliver of which is structured and organized where there's actual opinion is too infinitesimal to be seen. It is billions of uses. And our legal thoughts on this is the trial court focused on very highly structured, very specific parts of implied license, rather than the broader rule of implied from conduct. Implied from conduct, there is no reason to believe that a person, any person, can't use the meme. And, to the extent that implied license may not apply, or almost in tandem with this, the aspect of fair use. Here, the effect on the market, fair use has four factors. It's a matter of more than. What's our standard review following a jury verdict here? I mean, aren't you pushing a big rock up a big hill here? Yes. Okay. There's no doubt about that. It's a mixed question of law and fact. The jury came to the conclusion that fair use did not apply. Yes. However, but this is a fairly new area of law. Like, what do we do with pictures that everybody has, everybody's seen, and it's thrust in front of your face? There's just not a lot of precedent on that because they just don't get litigated. Well, and, you know, that's a real problem for everything on the Internet, right? I mean, if you just think about it, books are sold as e-books. They enter into the public domain. They don't enter into the public domain, but they're floating around there in a form where people can copy, print, move stuff around, right? That's true. And so, doesn't this, I mean, what's left of copyright law if we say that everyone's got either some implied license or that they've somehow passed in the public domain because there hasn't been, you know, the publishers and the owners of the copyrights aren't going out and litigating every minute of every day against every mom and pop and everybody else that's illegally distributing their copyrighted materials? Well, plenty do, first of all. And if you're asking for the differentiation, like why that and not this, orders of magnitude. One, I don't see authors giving, passing out their books on public domain. Or seeing their book on a public domain and saying, that's great, that's fantastic, thanks for doing this. Or asking people to distribute it. Some do, though. There are plenty of books that are being passed around as public domain works. And when they do that, we would like this law to apply, too. When the author is asking people for help to distribute it, they should be taken at their word, we think. So, essentially, what goes on here is that Greiner may have some advantage to allowing these, this photograph to move in public in non-commercial uses so that she may assert the commercial use when it's being used by entities that are looking to somehow profit by use of the meme, right? And her argument, of course, is that this is a campaign and they are profiting in a way that she should be compensated, as opposed to, you know, the teenage kid that, you know, says, I just made the soccer team and uses the meme. I think that's right. And I think that's part of the business model. The notoriety is what allows the contracts with the Verizons and Coca-Cola. It works because there is notoriety because she passes it around. And that is a business model that plenty of software companies use. And the Grateful Dead was famous for that, actually. Very inexpensive records. Are you familiar with the Andy Warhol case, the most recent from the Supreme Court? If not, I won't ask you. Okay, good. Thanks for your honest answers. All right. Also, preemption. There was a right of likeness case here that was going on, which seems to be complete. I'm sorry, it's not right of likeness. One of the four rights of privacy, it's a right of privacy suit. One of the four that involves is appropriation. It's appropriation. Where these seem to be the exact same set of facts as copyright infringement. And we suggest that this is preempted. The court said, well, yes, but you're making money off of it, and cited the Wray case. But the Wray case is based on a case called Facenda in this circuit, which is in turn based on three foreign cases, which the commerciality never seemed to matter. In fact, some of the places where the courts held that preemption did apply, the courts also found commerciality. So we believe that the court interpreted a factor as a mandate when it ought not to have. And if you look at the progeny of the cases, it contradicts the later holding by the trial court. And you're aware you're under rebuttal, just so you're aware. Thank you very much. I will save time. Sure. Save time for rebuttal. Sure, you may. Mr. Doniger. Good morning, Your Honors. May it please the Court, Stephen Doniger. My friend acknowledged that there is a business model here. And it's a business model that's very common. It represents a number of musicians who put their music on in the Instagram music library, which, of course, has terms of service that say this is only for personal, noncommercial use. One of my clients, one of her songs is in over 1.6 million reels. But if anyone wants to use that commercially, that's a different ballgame that's not authorized. My friend has pointed to absolutely nothing to suggest that my client ever authorized to put this into the public domain, period, let alone authorized, you know, commercial uses. Are you familiar with the Andy Warhol case of the Supreme Court? In fact, I wrote an amicus brief for it, which is the position the Supreme Court took on behalf of the court. Do you think there's anything left to fair use? Or what's now a better question? What's left of the fair use doctrine after the Andy Warhol case? Yeah, no. I mean, the Supreme Court only took on the first element of fair use, the transformativeness. And effectively, why I thought Warhol was such an important decision is that when you look at the Campbell case, the Supreme Court effectively said that adding new meaning or message creates a transformative use and satisfies the first prong. Hard stop. Now, of course, Campbell was in the context of a parody. And in parody, you've got a very broad, you know, that's inherently transformative. But that language, unless it's walked back, if it's applied to anything else, effectively collapses a derivative with — it makes any unauthorized derivative fair use as long as there's some new meaning or message. So Warhol really gave the Supreme Court the opportunity to walk that back and say — So there's nothing left to transformativeness? No, of course there is. They're saying that — Oh, you think there is? You read the other opinions, too. Yeah. Okay. Go ahead. What's left after that is that what the Supreme Court said is that adding new meaning is a factor in determining transformativeness, but it then has to be weighed against other factors like the commerciality of the use. Well, do you think commerciality is a touchstone after Warhol? It is. It is. And, you know, again — Okay. So how does that apply to this case? Andy Warhol saying commercialism, they call it. Yeah. Commercialism. Commercialism. Is the difference. Right. So this is a commercial use. This is a use that was designed to make money. You know, again, differentiating it from all of the memes out there that are being shared socially, not for financial gain or money-making purposes. So that cuts against the fair use analysis on the first factor. So if this was an attempt to just get votes as opposed to raise money, it would not be commercial. So we could have used exactly the same meme, changed the background just as they did, but just said vote for King. Then that would be okay? So that's an interesting question. To my mind, that would still be a commercial use because what he's doing — what the King for Congress would be doing is using the meme in order to get him a paid — like, that's his job. He's paid for his job in Congress. Anyone who's using it in furtherance and promotion of their job is a commercial use, as distinct from, hey, I won my soccer game, what Your Honor's suggestion was. But, again, that's only the first factor. Well, as a child going — in Missouri, we have NIL for high school students. Yes, we're the first state to do that. So, therefore, it could relate to the soccer person, couldn't it? That could be commercial. It could be. Yeah, the parents putting it on there and getting it out to all the Division I schools, trying to get the money early. You're weighing it. Again, the commercialism isn't the determining factor. It's also the level of transformativeness. And here, what was used was there's nothing new in the use of the image or the meme. There's nothing transformative, you know, from Lanny Greiner's picture. Well, they added fundar memes as a banner. Well, sure, they did. Yeah. So, there is some transformativeness. The mere fact that something's derivative doesn't necessarily make it transformative. Do you think this is why the Supreme Court's going to commercialism on that prong? Well, I think what the Supreme Court is saying is that commercialism is an offset against transformativeness. You know, if something is transformative, that may weigh in favor of fair use. But the more commercial the transformative use is, the less likely it is to be fair. I think that's what they're saying. And in that sense, there's certainly some overlap between the first factor and the fourth factor of the fair use test, as we argued to the Court, and the Court seems to have agreed with. Now, transformativeness has never been an issue in this case, right? Has it even been discussed? I don't think it's in your briefs. It has not. And the Warhawk case is not even in your brief, counsel, right? It is in our brief. It is in your brief? Absolutely. Okay. You think we overlooked the Warhawk case? I'm sorry the clerk and I missed it in your brief. Hey, I'm sorry the clerk and I missed it. But I read it too. Okay, so sorry. Proceed. It is in your brief. Proceed. All right. But you don't focus on it. I mean, I don't focus on it because everyone agreed that this is not fair use. The trial court, you know, said I found against them unfair use, but said there's still a question in fact for the jury. The jury found against them unfair use. I don't see a culpable fair use argument here in toto. Although some interesting discussions to be had, for sure. All right. The implied license claim, I don't know if I even need to discuss that, but it's clear to me that it was waived, and not just waived because of the failure to object, but waived because of the failure to propose any alternative test or instruction. I don't think, you know, you can't say, like, in preserving your rights for appeal, I think you need to say, well, no, Your Honor, I don't think this law applies to this case. Here's what I think the law that we should be given is. And then you make your record and you preserve it, and you give this Court something to say, to review, not just, you know, I can't win under the current test, and I'll just go up to the court of appeal and ask them to make some new law. Like, I've never seen anything like that before. So if the Court has any questions, I'm happy to give my two cents on it. But I, you know, beyond that, I'm at a loss. The only issue that I think is really an interesting one in this case is the fact that the Eighth Circuit has actually never spoken to the intersection of Rule 68 and Rule 504, the fee-shifting statute. And, you know, my friend does at least a cursory job of suggesting that, and I think he did at the trial court, that attorneys' fees as part of the cost-shifting of Rule 68 should have been mandatory. And I think this is, to the extent there's anything for this Court to perhaps clarify Eighth Circuit law on, it might be actually addressing that question. And, you know, at this point, the Eighth Circuit, you know, the First — the Seventh Circuit, the Ninth Circuit, and the Second Circuit and the Ninth Circuit in cases in trial courts, district courts in the Second, have said that Rule 68, you know, attorneys' fees are not part of the cost of shift. It cuts off attorneys' fees to the plaintiff, but it doesn't allow a defendant to recover their fees. And I think that there's — I think that this Court — I think it would be error for this Court to move away from that. That ruling actually follows — what's interesting is the Merrick decision of the Supreme Court. And in Merrick, the Court had actually held, you know, in that case it said that civil rights plaintiffs, along with other plaintiffs — this is a quote from Merrick — who reject an offer more favorable than what they thereafter recover at trial will not recover attorneys' fees for services performed after the offer is rejected. So effectively, the Supreme Court's position in that case was that it cuts off a plaintiff's fees, but it doesn't shift the ability of a defendant who beats a Rule 68 offer to recover those fees. And that's important because the purpose of Rule 68 is to encourage settlement. It's not to change the underlying statutes under which the causes of action are brought. And so when the underlying causes of action say that the prevailing party recovers fees and a defendant loses on the Merricks, then they, for that purpose, are not deemed to be — Kennedy. Counsel, do we have to resolve that when we have always said discretion, discretion, discretion, and the Copyright Act says the Court in its discretion. Right. That is true. And that sweeps in. So can we say our cases, we can just sweep this under the — as I said, and that's not a nice way to say it, defer to the district court, who's closer to everything. In fact, Justices Erickson and Koobs, in — what was it, 2023, just a few months ago, in the Beckler v. Rent Recovery Solutions case, reiterated the broad discretion afforded to trial courts in awarding fees. So, of course, the Court's ruling can be affirmed, but it still begs the question of whether — Leaves the question for another day? Or leaves the question for another day. But it begs the question of whether those fees could even have been properly requested by the committee in the first place. Well, there are some State rules — this is really unfair — but there are some State rule versions of Rule 68. Minnesota in particular. Yeah. Well, Minnesota and Florida both. Shift the burden if — you could be a non-prevailing party, but if you're closer to the number, you get your fees, right? Actually, no. The Minnesota version of Rule 68 specifically says that a losing defendant cannot recover attorney's fees, and it's clarifying the order. Okay. But there is — and in — I'm trying to figure out what — where we're at here, because I was — I didn't remember that. But I know the Florida rule, because I had a case that involved it. I don't know the Florida rule, sorry. Yeah, okay. Then I won't ask you, because it is profoundly unfair. But I remember the rule specifically states that you are a prevailing party if you end up paying less than what your offer of settlement was, and that you may recover all of your fees and costs from the date of the offer forward. It specifically says that. Now, with this rule not saying that, it still leaves it to the discretion of the judge in any event. I mean, if the Florida section says that, I can't speak to that. I can say the Minnesota specifically says they do not. The First Circuit says they do not. The Fifth Circuit says they do not. The Seventh Circuit says they do not. The Ninth Circuit says they do not. Other district courts say they do not. The only court — the only appellate court to ever say that fees can shift is the Eleventh Circuit in the Jordan case. But the Eleventh Circuit didn't address the language from Merrick where the Supreme Court said that the fees have to be properly awardable under the statute. Is Merrick a copyright case? Pardon my ignorance of the case. Merrick? The case you're referring to.  It's a copy — it's not a copyright case. No. Doesn't that greatly distinguish this case? Because we have a statute? So I — no. A Federal statute. Yeah. I don't think so, because the Ninth Circuit and the Seventh Circuit in — those are copyright cases. The Fifth and the — and the First aren't. But they specifically look at the language of Merrick, and they say that what the Supreme Court says in Merrick is that it's the — sorry. What the Supreme Court — let's pretend I can speak English. What the Supreme Court says in Merrick is that it's the fees properly awardable under the statute. And so you look to the language of the statute. And in both of those cases, in both the Ninth and the — and the Seventh Circuit, they say because the Copyright Act says the prevailing party, a non-prevailing defendant is not entitled to fees under the language of those statutes per Merrick. That's how they've reasoned it out. And that is the exact same reasoning that the First Circuit and the Fifth Circuit apply, albeit not in the context of copyright cases. In fact, I think one of the — I'll just take a few more minutes, because I don't have much else, and I think it's interesting. There's a Second Circuit case, Stanzi v. City of New York, that holds that because Section 1983 claims allow a civil rights defendant to recover attorneys' fees only when the plaintiff's claims are vexatious, frivolous, or brought to harass, embarrass or embarrass a prevailing plaintiff by virtue of her victory, we cannot conceive of a situation in which attorneys' fees could properly be awarded to a non-prevailing defendant under Rule 68 in a civil rights action. In other words, you're fundamentally changing the nature of the underlying statute of when a prevailing defendant should recover fees by making them some mandatory  Robertson Are fees mandatory in 1983 cases? Gershengorn Well, again, for a prevailing plaintiff can get fees, a prevailing defendant can get fees, as I just read, when the plaintiff's claims are found to be vexatious, frivolous, or brought to harass or embarrass. And so a prevailing defendant can recover under those circumstances, of course, but not when their claims are not vexatious or frivolous, but merely because a plaintiff didn't guess right how much a jury was going to award. So thank you so much. It's been an honor speaking to you all, and I trust there's no other questions, and I'll let my friend come back up to you. Roberts See none. Thank you for the argument. Mr. Blankenship. Blankenship Thank you, Your Honor. When my colleague says that we have nothing to point to that indicates that Lanie Griner would allow people to use the meme, I think that's – I think there's plenty of evidence, including her own instructions. In fact, she was sent memes with politicians with the success kit meme three or four times, and those are in the record. And each time she either cheered it on or provided some sort of commentary, not knock it off. That never happened. Were they raising money, those other ones? Does the record reflect whether the other candidates were raising money or just using it for some – I started to say cute point, some relevant point? The – Does the record show that? In some cases, yes, for promotion. Does the record show? In some cases, no. Okay. Both the ones on the record are not by a politician and not to raise money. Okay. Go ahead. Thank you. One of the things that we asked for in this case was burden shift, which is really rare, by the way. That's not – that's something that you very rarely see, but we think it applied in this instance. Normally, license as a defense has to be approved by the alleged infringer. But here, in a circumstance where there are multiple outstanding contracts that the copyright holder cannot produce, and those contracts have sub-licensing calls, it becomes unclear whether the infringer is using one of the licensed copies or the unlicensed copies. And we asked for that burden shifting below. The trial court said no. Okay. So we start off – you would concede that ordinarily, if a defense is an affirmative defense, the burden rests on the person asserting the defense. Right. And you're saying you asserted the defense, and you raised it sufficiently that the burden shifted back under some burden shifting analysis because they had, within their sole possession, records and documents that they failed to produce because they claimed not to have them in their sole possession. That's right. What we showed is – and she admitted, I have contracts I cannot find. And those were the earlier contracts. Several times, she had – advertised by a corporation, a friend called her and told her, hey, did you know that your son's in a vitamin water commercial? No, I didn't know that. And so did – but in order to – ordinarily, in order to shift the burden back, you first have to establish the essential elements of your affirmative defense. You have to get them in, one, two, three, or you have to move for sanctions saying due to the spoliation and failure to protect what is now evidence in this case, you should be, as a discovery sanction, required to prove the absence of the affirmative defense. In this case, implied license, right? Now, no such spoliation motion is ever made, right? So I think that leaves you where you had to establish first the elements of the defense. Or am I wrong? Because I'm wrong on a lot of stuff. I wouldn't acknowledge them out of time. Can I finish this one? No, no. Answer as long as Judge Erickson has questions. Okay. The – this is an exotic creature. And this comes from principally the Bourne case in the Second Circuit. And there's no indication that they're following like a sanctions sort of route there. Yes, we did not move for sanctions. But you will find it in the motion in Lemony where we ask for, as part of the jury instructions, we want the burden shifting there. So we very conspicuously ask for it, not as part of a sanction route. And I don't think Bourne stands for the proposition that you need to go through and point out that you meet the defense elements in order to ask for what is essentially an end around to the defense elements. Because that's what you're asking for. You're like, how can we prove the – it's almost against 22. How can we prove the defense if we don't know what contract we're working with? Okay. Thank you for your argument. Thank both counsel for their argument. Two cases, 22-3623 and 23-2117.